IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

QUENELLE TAYLOR                    :

                                   :

       v.                          :    Civil Action No. DKC 13-1678

                                   :

PRINCE GEORGE'S COUNTY,            :
MARYLAND, et al.                   :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights case is the motion for summary judgment filed by Defendants Josefina Perdomo and Clint Woodside (ECF No. 17). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Defendants' motion for summary judgment will be granted in part and denied in part.

**I.   Background**

**A.   Factual Background**

The parties recite somewhat different versions of the facts, and the differences will be noted.  On March 7, 2013, the Prince George's County Police Department obtained a search and seizure warrant for saliva swabs from Anthony Ford in connection with a murder that took place on March 21, 2012.  (ECF No. 17-2, at 2).  Anthony Ford is an African male, has shoulder length black dreadlocks, brown complexion, and brown eyes.  The warrant

application in support of probable cause stated that "[a] lookout was broadcasted for two suspects seen fleeing the area of the shooting." (*Id.* at 4). One fleeing suspect was described as "a black male wearing a green coat with long dreads." (*Id.* at 4). The warrant application further explained that Anthony Ford's cell phone records placed him in the area of the murder. (*Id.* at 5). "A witness further confirmed that [the] person using that phone,[], was Anthony Ford who matched the description of the person with long dreads fleeing the scene of this [m]urder." (*Id.*). The purpose of the search and seizure warrant was "to obtain oral DNA swabs from Anthony Ford's person in order to compare with the DNA evidence recovered during the investigation." The warrant application further stated that "evidence directly related to the[] crimes will be recovered from [Anthony Ford]" at 5503 Sachem Drive, Oxon Hill, MD 20745." (*Id.*).

Detectives Josefina Perdomo and Clint Woodside with Prince George's County Police Department were tasked with executing the search and seizure warrant for Anthony Ford's DNA saliva swab. (ECF Nos. 17-3, at 3 & 17-4, at 3). After obtaining the warrant, Detective Perdomo conducted surveillance on what the police believed to be Anthony Ford's home located at 5503 Sachem Drive in Oxon Hill, Maryland. (ECF No. 17-3, at 3). Detective Perdomo instructed an officer to identify the license plate

number of a Nissan Altima parked in the suspect's driveway, but
as the officer "was driving by the address, a guy was coming out
to the car," so Detective Perdomo told the officer to keep
driving.  A man matching Anthony Ford's description left the
house and got into the car.  (*Id.* at 5).  When the officers
tried to stop the car, the suspect maneuvered the vehicle in a
way to avoid the stop.  (*Id.* at 6, Perdomo depo. ("he was able
to stop, reverse a little bit, and then pull out, made [] a
strange U-turn to go up the street [] towards the Beltway")).
The officers decided not to pursue the Nissan Altima that
Anthony Ford was believed to be driving; instead, the officers
noted the time that the Nissan Altima left the driveway, and
Detective Perdomo believed that the suspect may have been
driving fast enough to trigger a speed camera near Sachum.
(*Id.*).  She suggested that the officers "call the guys that are
in charge of the speed light cameras to see if they could get a
picture of the car. . . . [The officers] were just going by
chance because [the suspect] had been going so fast."  (*Id.*).
Investigation revealed that the speed camera captured a vehicle
with the same make, model, and color that passed the speed
camera at the approximate time that Anthony Ford was believed to
be driving the Nissan Altima.  (ECF No. 17-4, at 17).  According
to Detective Woodside, the location of the vehicle that the

speed camera captured was approximately fifty feet from the vehicle that left the suspect's home in Sachum. (*Id.*).

From the photos captured by the speed camera, the detectives obtained a license plate of the vehicle, a Nissan Altima, that they believed Anthony Ford was driving when he escaped the police. Detective Woodside determined that the vehicle was registered to a male and a female with the last name Taylor, both African American. (*Id.* at 4, 6). From the vehicle registration, Detective Woodside identified the address to which the vehicle was registered and the Taylors' dates of birth. The vehicle was registered to an address at Surrey Square Apartments located off Pennsylvania Avenue. (*Id.* at 5). Detective Woodside then visited Surrey Square and spoke with a property manager. (*Id.* at 7). He asked about the particular address and the apartment in question. Detective Woodside also showed the property manager a picture of Anthony Ford. (*Id.* at 8). According to Detective Woodside, the property manager "said he saw Anthony Ford at [the] address that came back to Mr. and Mrs. Taylor." (*Id.*). Detective Woodside then further investigated the vehicle license plate; he put it into the "tag reader system and it came back to an address over in [] Fort Washington." (ECF No. 17-6, at 2). On March 13, 2013, Detective Woodside also drove by the Surrey Square address associated with the Taylors and confirmed that the license plate of the vehicle in

the driveway matched the license plate in the photo from the speed camera and the tag reader system. (*Id.* at 5). Subsequently, he called the acting sergeant to inform him that the detectives planned to conduct "an early morning show up." (*Id.*).

On March 14, 2013, at approximately 5:00 a.m., Detectives Woodside, Perdomo, and other officers took up positions in the area of the suspected Nissan Altima. (ECF No. 17-4, at 9). At around 7:45 a.m., Detective Woodside observed a male matching Anthony Ford's description walking toward the vehicle, with a female behind him. The male entered the driver's side and the female got in the passenger's side of the vehicle. (*Id.* at 9-10). At this point, Plaintiff's and Defendants' version of events diverge.

### 1.  Plaintiff's Version of Events

Plaintiff states that he left his house to take his wife to the metro. After he got into his car – a Nissan Altima – he saw policemen running towards the car "with their guns pointed at the car." (ECF No. 18-1, at 4). He states that they were yelling, "[g]et the f--- out the car." (*Id.* at 6). He asserts that he did not immediately get out of the car, but threw his hands up "to let them know [that he doesn't] have anything on [him]." (*Id.* at 7). Detective Woodside then kicked the back door of the driver's side of the Nissan Altima. Plaintiff

asserts that "[Detective Woodside] kicked a dent in the car and the car shook." He states that Detective Woodside again repeated "get the f--- out the car. Turn the car off." (*Id.*). Plaintiff states that he did exactly what Detective Woodside told him. Plaintiff explains that as he was "pushing the door open, [Detective Woodside] opened the door more . . . he pulled the door open." (*Id.* at 8). He states that when he stepped out of the vehicle, Detective Woodside grabbed him by the shoulder, and told him "to get the f--- on the ground." (*Id.*). Plaintiff states that when he got on the ground, he hit his kneecaps. He also avers "that's when [Detective Woodside] put his foot on [Plaintiff's] back, [] hard." (*Id.* at 9). At that point, another officer came and "started patting [him] down, [] checking for stuff like weapons[] drugs or something." Then, Detective Woodside pulled Plaintiff's wallet from his pocket and asked for his identification. (*Id.* at 10). Plaintiff states that he was on the ground no longer than two minutes. (ECF No. 17-8, at 6). Then he stood up. He states that he suffered injuries to his back and kneecaps from when he hit the ground and from when Detective Woodside put his foot on his back, but Plaintiff did not tell any officer at the scene that he was injured because he was in shock. (ECF No. 18-1, at 14).

Although Plaintiff does not mention this fact in the complaint, he stated in his deposition that Detective Woodside

6

searched his vehicle when he was standing outside after he was patted down and stood up. (*Id.* at 12). He states that "the driver's side, the passenger's side, glove compartment, [] trunk, [and] back seat" of his vehicle were searched. (*Id.*). Plaintiff then went to Detective Woodside's car. Detective Woodside asked Plaintiff questions about how long Plaintiff has lived at his current address, who drove the Nissan Altima besides him, and whether he knew Anthony Ford. (*Id.* at 11).[1] Plaintiff asserts that he knew an Anthony Ford on Facebook, who stayed in Florida. (ECF No. 17-8, at 9). Plaintiff states that Detective Woodside asked to look at his phone, which Plaintiff allowed. (*Id.* at 7). He also gave Detective Woodside his phone number. Detective Woodside showed Plaintiff a picture of Anthony Ford and informed Plaintiff that they were looking for him as a suspect in a murder. (*Id.* at 8). Upon seeing a picture of Anthony Ford, Plaintiff responded that he "could see what he's talking about. I mean, the guy, he has long hair, I have long hair and that's the only thing that I really could see." (*Id.*).

In the meantime, Detective Perdomo stood outside with Shavonne Taylor, Plaintiff's wife. Detective Perdomo then went

---

[1] Plaintiff recorded some of his conversation with Detective Woodside in the car, and the recording is included as an exhibit to Defendants' motion for summary judgment. (*See* ECF No. 17-11).

inside Plaintiff's home with Shavonne Taylor, at which point the
house was searched.   Shavonne Taylor testified in her deposition
that no officer asked "for permission to look for a particular
item in [the] house."   (ECF No. 18-2, at 3).   She states that
three officers went upstairs to look through the house, and
Detective Perdomo stayed downstairs with her.   (*Id.*).   Ms.
Taylor states that another officer then came inside the house
and asked whether the house was searched.   Detective Perdomo
"told him, yes, but you're welcome to search it again.   And so
he said, yes, I'll do that.   So he searched it again."   When
Plaintiff entered his home after being in Detective Woodside's
vehicle, he found officers in his home.   Plaintiff did not find
anything damaged or destroyed, but "[c]lothes [were] thrown
everywhere in one of [their] rooms."   (*Id.* at 15).   Plaintiff
states that he also did not give any officer permission to
search his home.

   2.   **Defendants' Version of Events**

   Defendants recite a different version of events.   Detective
Woodside states that he got out of his vehicle at 7:45 a.m.,
drew his weapon, yelled at the driver, "let me see your hands,
open the door, open the door, just giving different commands."
(ECF No. 17-4, at 10).   He states that Detective Perdomo came
and "backed [him] up on the driver's side. . . .   Eventually
[the] door opened."   (*Id.*).   Detective Woodside contends that

the driver – who he thought was Anthony Ford – did not immediately exit the vehicle. Detective Woodside states that he then kicked the car – putting a dent in the door – to "gain his attention." (*Id.* at 11). Then, "[t]he gentlemen [Detective Woodside] saw[, who he] thought was Mr. Ford[,] put his hand out, started going to the ground." Detective Woodside maintains that the driver exited the car on his own, but that once "he went to the ground, [Detective Woodside] pulled his sweater." (*Id.* at 11-12). Detective Woodside denies putting his foot on Plaintiff's back or touching Plaintiff, aside from pulling on his sweater. (*Id.* at 12). Detective Woodside states that neither he nor any other police officer physically grabbed or pulled Plaintiff. Detective Woodside states that once Plaintiff was on the ground, he "looked at his face, [he] notice[d] he wasn't Mr. Ford so, [he] asked him to stand up." (*Id.*). At that point, Detective Woodside realized that the individual, Plaintiff Quenelle Taylor, was not Anthony Ford, the murder suspect. Detective Woodside concedes that no one obtained Plaintiff's consent to search his vehicle. (*Id.* at 13). Detective Perdomo was not present when Plaintiff's car was searched. Detective Woodside states that a few of his coworkers, including Detective Perdomo, searched Plaintiff's house. (*Id.* at 14). Detective Woodside asserts that after he stood outside with Plaintiff for "a while," they went to talk in

Detective Woodside's vehicle because it was cold outside. (*Id.* at 13).

Detective Perdomo avers that she and another officer – Detective Bush – spoke with Ms. Taylor outside of the house. According to Detective Perdomo, they remembered the specific coat that the suspect was wearing the day before, and Ms. Taylor stated, "you can look at his coats." (ECF No. 17-3, at 10). Detective Perdomo then went inside Plaintiff's home with Ms. Taylor.

### B.   Procedural History

On May 16, 2013, Plaintiff filed a complaint in the Circuit Court for Prince George's County (ECF No. 2). The complaint asserted six counts against Detectives Woodside and Perdomo, in their individual and official capacities: state law claims for assault (count I), battery (count II), and false arrest (count III); and three Section 1983 claims, 42 U.S.C. § 1983, alleging excessive force (count VIII), arrest without probable cause (count VI), and illegal search (count IV). The complaint also asserts that Prince George's County is liable for: (1) assault, battery, and false arrest under the doctrine of *respondeat superior*; and (2) violation of the Fourth Amendment based upon the County's custom, policy, and practice of and deliberate indifference to the illegal practices of its officers.

The action was removed to this court on June 11, 2013. (ECF No. 1). Defendants answered the complaint on June 14, 2013. (ECF No. 5). On July 9, 2013, Prince George's County moved to bifurcate the trial and stay discovery, which Plaintiff did not oppose. (ECF No. 11). Judge Williams granted the motion for bifurcation and stay of discovery, holding that the "County's liability shall be stayed pending resolution of the claims against individual Defendants." (ECF No. 13, at 4).[2] The individual Defendants moved for summary judgment on December 4, 2013. (ECF No. 17).[3] Plaintiff opposed the motion on December 9, 2013 (ECF No. 18), and Defendants replied on December 19, 2013 (ECF No. 20).

## II.  Standard of Review

Summary judgment is governed by Fed.R.Civ.P. 56(a) which provides that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court of the United States has clarified that this

---

[2] The term "Defendants" in this opinion will refer only to the individual detectives.

[3] Defendants' memorandum in support of summary judgment and one of the accompanying exhibits contain personal identifying information, such as Anthony Ford's birthdate. Pursuant to Fed.R.Civ.P. 5.2 and the June 18, 2013 scheduling order, personal identifying information should have been redacted. ECF Nos. 17-1 and 17-2, which contain Anthony Ford's birthdate, will be placed under seal and Defendants will have seven (7) days to file redacted versions.

does not mean that any factual dispute will defeat the motion: "[b]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must set forth specific facts showing that there is a genuine issue for trial." *See Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (*quoting* former Fed.R.Civ.P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility." *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *See Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (*quoting Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) and *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## III. Analysis

### A.    Section 1983 Claims

Detectives Woodside and Perdomo contend that they are entitled to qualified immunity as to the Section 1983 claims. Qualified immunity is an affirmative defense to Section 1983 claims and "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In determining whether the legal right is clearly established, it is critically important to avoid defining the applicable right at too abstract a level." *Rish v. Johnson*, 131 F.3d 1092, 1095-96 (4th Cir. 1997).

Two inquiries must be satisfied to determine whether an official is entitled to qualified immunity: (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand that their conduct was unlawful.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds in Pearson*, 555 U.S. at 236. Courts are "permitted to exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Batter v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003). The burden is on the Plaintiff to prove that the alleged conduct violated the law, while the defendant must prove that the right was not clearly established. *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007).

### 1. Excessive Force (Count VIII)

As an initial matter, Plaintiff does not challenge the mistaken identity. Instead, Plaintiff argues that "qualified immunity would not serve to shield a police officer who uses excessive force in stopping or detaining an individual regardless of whether or not there is an issue concerning someone's identity." (ECF No. 18, at 6).

Excessive force claims "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Noel v. Artson*, 641 F.3d 580, 590 (4th Cir. 2011) (*quoting Graham v. Connor*, 490 U.S. 386, 395 (1989)). Reasonableness of force is analyzed on the basis of the totality of the circumstances according to an objective standard. This process requires balancing "the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (citation omitted). Relevant factors in making this determination include the severity of the crime, whether there is an immediate threat to the safety of the officer or others, and whether the subject is resisting the stop or attempting to flee. *See Graham*, 490 U.S. at 396. The determination is to be made "from the perspective of a reasonable officer on the scene." *Id.* The Fourth Circuit has held that reasonableness is determined "based on the information possessed by the officer at the moment that force is employed." *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005).

Although Plaintiff asserts excessive force claims against both detectives, he does not contend that Detective Perdomo used any force toward him. Accordingly, she will be granted summary judgment on the excessive force claim. To prove a violation of a constitutionally protected right as to Detective Woodside, Plaintiff must prove that Detective Woodside used force in an objectively unreasonable manner under the circumstances. Plaintiff asserts that he has:

> alleged sufficient facts to demonstrate that
> he was simply attempting to take his wife to
> work when he was ordered out of his car at
> gunpoint and then forced to the ground by
> Officer Woodside despite the fact that he
> was not resisting arrest or failing to
> comply with Officer Woodside's commands.

15

(ECF No. 18, at 7).   Crediting Plaintiff's version of events,
there is a genuine dispute as to whether Detective Woodside used
excessive force against Plaintiff.   *See Saucier*, 533 U.S. at 201
(when determining whether defendants are entitled to qualified
immunity, a court must consider the facts "in the light most
favorable to the party asserting the injury.").   Plaintiff
asserts that when he saw officers running up to his vehicle with
guns drawn, he "threw [his] hands up to let them know [he
didn't] have anything on [him]" and that he was not a threat to
them." (ECF No. 18-1, at 7).   Detective Woodside then ran up to
the car and "automatically kicked . . . the driver's side back
door.   He kicked a dent in the car and the car shook." (*Id.*).
Plaintiff then followed Detective Woodside's command to turn off
the car.   According to Plaintiff, he kept his hands in the air
and did not resist Detective Woodside's commands, but when he
exited the vehicle, Detective Woodside grabbed Plaintiff by the
shoulder and told him to "get the f--- on the ground." (*Id.* at
8).   Plaintiff asserts that as he was getting on the ground,
Detective Woodside - with his gun still drawn - forced and threw
Mr. Taylor on the ground, causing Plaintiff to hit his kneecaps.
Detective Woodside then told Plaintiff to stay on the ground

with his hands spread, at which point he put his foot on Plaintiff's back "hard." (*Id.* at 9).[4]

Defendant argues that he acted reasonably because he had a search warrant for the saliva swab from murder suspect Anthony Ford, and based on his investigation, believed that Plaintiff was the suspect. He asserts that "[t]he officers' conduct of surrounding the vehicle of a suspect for a pat down is reasonable. Taylor's identity was learned and the pat down was conducted in a minute and he was allowed to stand." (ECF No. 17-1, at 12). Defendant's arguments miss the mark. First, the fact that the officers obtained a search warrant for the DNA saliva swab did not, in and of itself, authorize Detective Woodside to use force in executing the warrant. Furthermore, Plaintiff's excessive force claim is premised on Detective Woodside's acts of kicking his car door, grabbing him, forcing to the ground, and putting his foot on his back. Crediting Plaintiff's assertions that he complied with Detective Woodside's commands and did not resist the stop, there was no need to use any force to effectuate the stop under the circumstances. Defendant's assertion that Anthony Ford previously fled from the police when they conducted surveillance of his home would not justify applying force when the suspect

---

[4] Detective Woodside denies putting his foot on Plaintiff's back or physically grabbing Plaintiff and throwing him on the ground. (ECF No. 17-4, at 11-12).

shows no resistance, as Plaintiff argues here.   Plaintiff asserts that as soon as he saw the officers running to his car, he put his hands up to show that he was not a threat and followed all of their commands.   Defendant has not proven – nor does he argue – that the right to be free from excessive force was not clearly established by March 2013, when Plaintiff was stopped.   Accordingly, summary judgment will be denied as to the excessive force claim against Detective Woodside.

### 2. Plaintiff's Arrest Claim (Count VI)

Plaintiff frames Count VI of the complaint as a claim for arrest without probable cause, but Plaintiff was not actually arrested.   Although Plaintiff's complaint suggests that he challenges the initial stop, in the opposition, Plaintiff acknowledges that "the police in this case certainly had the right to approach Mr. Taylor and to question him and even to pat down his outer clothing for weapons for their safety given their suspicion that he might have been Anthony Ford."   (ECF No. 18, at 8).   Plaintiff argues, however, that "any further justification for [the detectives'] decision to continue to hold Mr. Taylor and to question him vanished after they determined that he was *not* Anthony Ford."   (*Id.*) (emphasis in original).[5]

---

[5] Although Plaintiff asserts the "arrest without probable cause" claim against Detective Perdomo, it is undisputed that she did not participate in detaining Plaintiff after it was

Detective Woodside asserts that Plaintiff was detained even after he determined that Mr. Taylor was not the murder suspect for purposes of investigating whether he had any connection to Anthony Ford.  Thus, the issue is whether Plaintiff's encounter with Detective Woodside after it was determined that he was not Anthony Ford constituted a seizure governed by the Fourth Amendment.

The Fourth Amendment, in pertinent part, provides individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  In determining whether there was a seizure, the "crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (*quoting Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).  The United States Supreme Court has identified three categories of police-citizen encounters. *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002).  "Each category represents differing degrees of restraint and, accordingly, requires differing levels of justification." *Santos v. Frederick Cnty. Bd. of Comm'rs*,

---

determined that he was not Anthony Ford.  Accordingly, she will be granted summary judgment on Count VI.

725 F.3d 451, 460 (4th Cir. 2013).  Consensual encounters do not constitute seizures and thus do not implicate Fourth Amendment protections.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  Brief investigative detentions – known as "*Terry* stops" – require reasonable, articulable suspicion of criminal activity.  *Terry v. Ohio*, 393 U.S. 1, 21 (1968).  Arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2006).

"A police-citizen encounter rises to the level of a Fourth Amendment seizure when 'the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Santos*, 725 F.3d at 460 (*quoting United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012)).  This is an objective inquiry focusing on whether "'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *Id.* at 299 (*quoting Mendenhall*, 446 U.S. at 553)).  The Fourth Circuit has identified a number of non-exclusive factors to consider in determining whether a police-citizen encounter constitutes a seizure:

> the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether

> they treated the defendant as though they
> suspected him of "illegal activity rather
> than treating the encounter as routine in
> nature."

*Id.* at 299-300 (*quoting United States v. Gray*, 883 F.2d 320, 323 (1989)). "Although the inquiry is objective – and thus the subjective feelings of the law enforcement officers and the subject are irrelevant – we also consider certain individual factors that 'might have, under the circumstances, overcome that individual's freedom to walk away.'" *Santos*, 725 F.3d at 461 (*quoting Gray*, 883 F.2d at 323).

Detective Woodside stated that when Mr. Taylor was on the ground, he looked at his face, noticed he was not Anthony Ford, and then asked him to stand up. He recalls that Plaintiff stood outside with him "for a while." (ECF No. 17-4, at 13, Woodside depo.). Then, Plaintiff and Detective Woodside sat in Detective Woodside's vehicle because – according to Detective Woodside – it was cold outside. Although Plaintiff spoke only with Detective Woodside in the car, other officers spoke with Plaintiff's wife and subsequently entered Plaintiff's home. In his car, Detective Woodside questioned Plaintiff regarding whether he had any connection to Anthony Ford, how long he had lived in the area, and where he was the previous night. Plaintiff stated in his deposition that Detective Woodside asked "a lot of questions":

> How long have I been married.  Where am I
> originally from.  How long have I stayed at
> [] my current address.  Who else drives this
> car besides me.  Do I know Anthony Ford, I
> think his name was -- of the guy, whoever he
> was.  Do I know him.  They kept asking me do
> I know him; do I hang with him; where do I
> hang at; . . . who do I kick it with; where
> was I [] – the morning prior to when they
> pulled up on me.

(ECF No. 18-1, at 11).  The brief recording of the conversation in the car reflects that Detective Woodside mentioned to Plaintiff the similarity in appearance with Anthony Ford and also showed Plaintiff a photograph of Anthony Ford.  Detective Woodside also asked Plaintiff for his cell phone number, which Plaintiff gave to him.  Defendant argues that "the detention continued briefly in order for the officers to determine that there was no connection between Ford and Taylor."  (ECF No. 17-1, at 13).  Although neither party asserts approximately how long Plaintiff was detained, it appears that he was detained while his house was being searched, given Plaintiff's testimony that he returned to his house to find the officers still there and "[c]lothes thrown everywhere in one of our rooms."  (ECF No. 18-1, at 15).  This was *not* a situation where police casually approached Mr. Taylor and asked him questions in an attempt to ascertain whether he had any connection to Anthony Ford.  Mr. Taylor was questioned after Detective Woodside brandished his weapon, forced Plaintiff on the ground, kicked his car, put his

22

foot on Plaintiff's back, and another officer patted him down. *Cf. Santos*, 725 F.3d at 461 ("[t]hey came across Santos as part of a routine patrol, rather than singling her out for investigation."). Viewing the allegations in the light most favorable to Plaintiff, there is a question of fact whether under the totality of the circumstances a reasonable person would have felt free to leave.

If Plaintiff's continued detention constituted a seizure, the question becomes whether the seizure was reasonable. What constitutes a reasonable seizure "depends upon all of the circumstances surrounding the . . . seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); *Figg v. Schroeder*, 312 F.3d 625, 636 (4th Cir. 2002). Plaintiff's interaction with Detective Woodside after it was determined that he was not Anthony Ford is akin to an "investigatory detention" under *Terry*, which requires reasonable articulable suspicion that a crime had been or was about to be committed. *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000). "A detention requires more than an 'inchoate and unparticularized suspicion or hunch,' but it does not require probable cause." *United States v. McBride*, 676 F.3d 385, 392 (4th Cir. 2012) (*quoting Terry v. Ohio*, 392 U.S. at 27). "Courts must employ a commonsense and contextual approach in evaluating the validity of an investigatory detention." *McBride*, 676 F.3d at 392. The

term "reasonable suspicion" should be viewed as a "nontechnical" concept, which incorporates the "factual and practical considerations of everyday life" in which prudent persons act. *Ornelas v. United States*, 517 U.S. 690, 695 (1996).

Detective Woodside argues that "[t]he questioning of Taylor to determine whether there was any connection between him and Ford was reasonable given all the information and conclusions reached by the officers." (ECF No 17-1, at 12). In the reply brief, Defendant contends that "[t]he detention was legally justified by Woodside's belief that Ford was driving Taylor's vehicle when he fled from police the day before the incident and the apartment manager's identification of Ford as a person seen at Taylor's apartment." (ECF No. 20, at 3). Although these events may have justified mistaking Plaintiff for Anthony Ford, once Detective Woodside realized that Plaintiff was not, in fact, Anthony Ford, further detention required consent or reasonable articulable suspicion. Based on the record, Detective Woodside did not have reasonable articulable suspicion that Mr. Taylor committed or was about to commit a crime. Indeed, Detective Woodside testified in his deposition that the "investigation was trying to determine if Mr. Taylor was a friend of Anthony Ford['s]." (ECF No. 17-4, at 14). When asked whether Mr. Taylor's friendship with Anthony Ford would be against the law, he responded:

> No, that's not against the law.  But I'm
> looking for a particular person and I'm
> trying to get any information that could
> lead to me finding Mr. Ford.

(*Id.*).  Defendant asserts that "[Mr.] Taylor ignores the fact that although [he] was determined not to be subject of the warrant, the officers were attempting to ascertain whether Taylor had any connection or association with the subject of the warrant." (ECF No. 20, at 1).  But absent consent or reasonable articulable suspicion of criminal activity by *Mr. Taylor* after Detective Woodside confirmed the mistaken identity, Detective Woodside could not detain an individual who turned out *not* to be the murder suspect in an effort to further his investigation as to Anthony Ford.

Defendant relies on *Owens-El v. Kapfhammer*, Civil No. JFM-10-3213, 2013 WL 951734 (D.Md. Mar. 8, 2013), *Thompson v. Prince William Cnt'y*, 753 F.2d 363 (4th Cir. 1985), and *Mazuz v. Maryland*, 442 F.3d 217 (4th Cir. 2006), but those cases are inapposite.  In *Owens*, one of the plaintiffs was arrested based on a reasonable suspicion that he was the fleeing suspect in the drug operation.  There were no allegations in *Owens* that plaintiff was detained even after officers determined that he was not the second fleeing suspect.  *Thompson*, 753 F.2d at 365, also does not aid Defendant's position.  *Thompson* involved police officers who reasonably mistook an innocent party for the

suspect in executing a properly obtained warrant.  Notably, when the Commonwealth's attorney was informed that plaintiff was not the person from whom an undercover officer purchased marijuana, all charges were dismissed.  Similarly, in *Mazuz*, 442 F.3d at 220, the police were in the process of executing a valid search warrant on several dorm rooms, but mistakenly detained the resident of the wrong room.  "Upon realizing the mistake, the officers *immediately* released the residents and left the room." *Id.* (emphasis added).  The Fourth Circuit held:

> the seizure of Mazuz was reasonable . . . mistaken entry into Mazuz's room was reasonable under the Fourth Amendment . . . [t]he brief detention was an appropriate measure incident to the search [of the room], there is no evidence that any excessive force was used during the detention, and *the detention ended as soon as the officers discovered their mistake*.

*Id.* at 230-31 (emphasis added).  Unlike in *Owens*, *Thompson*, and *Mazuz*, Detective Woodside continued to detain Plaintiff even after he determined that Mr. Taylor was *not* the murder suspect. The right to be free from detention absent consent or reasonable articulable suspicion was clearly established at the time of the events at issue here.  Accordingly, Plaintiff has demonstrated facts sufficient to repel a motion for summary judgment on Count VI.

### 3.  Illegal Search

Plaintiff also asserts an "illegal search" claim against Detectives Perdomo and Woodside.  Notably, in the complaint, Plaintiff asserts that "[a]t the time that he was stopped, [P]laintiff had the constitutional right, pursuant to 42 U.S.C. Section 1983 and the 4th Amendment to the United States Constitution[,] to be free from the search *of his home* without a warrant."  (ECF No. 2 ¶ 22) (emphasis added).  In the opposition, however, Plaintiff challenges the constitutionality of the search of his home *and his car*.  Nowhere in his complaint does Plaintiff even mention that his car was searched.  In his deposition, however, Plaintiff states that his car was searched while he was standing outside with the officers.  Plaintiff cannot, at this late stage of the litigation, assert new claims or allege facts outside the scope of the claims he raised initially.  Moreover, although Plaintiff asserts the illegal search claim against both Detectives, it is undisputed that Detective Woodside did not participate in the search of Plaintiff's home.  Accordingly, Plaintiff's claim of illegal search will be considered only as to his home and only against Detective Perdomo.

It is undisputed that a warrantless search was conducted of Mr. Taylor's home.  A search of a home without a warrant is presumptively unreasonable under the Fourth Amendment.  *Payton*

*v. New York*, 445 U.S. 573, 586 (1980).   There are several established exceptions to the warrant requirement, however, including exigent circumstances and consent. *Steagald v. United States*, 451 U.S. 204, 211 (1981).   Regardless of whether an exception applies, a warrantless search generally must be supported by probable cause. *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985).

Defendant had a search and seizure warrant for DNA saliva swabs from Anthony Ford.   Although Detective Woodside stated in his deposition that he was operating under the assumption that Anthony Ford was hiding in Plaintiff's home, there is no indication that Detective Perdomo believed Anthony Ford to be in Plaintiff's home at the time she participated in searching his home. *See, e.g., Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980) (explaining that, to justify a warrantless search for the subject of an arrest warrant in the home of a third party, "not only must the officers have probable cause to believe the person named in the arrest warrant is on the premises of the third person, but there must also exist an appropriate exception to the warrant requirement," such as "exigent circumstances"). Indeed, the only justification Defendant has offered for searching Mr. Taylor's home is that "[a] search of Taylor's [] home was conducted to determine whether a coat Anthony Ford was seen wearing on the night of the murder could be located." (ECF

No. 17-1, at 4).   Detective Perdomo also stated in her deposition that she decided to search the house because she thought Plaintiff and Anthony Ford were friends and "the investigation [was] still ongoing – still believing that Mr. Ford has a connection with Mr. Taylor." (ECF No. 17-3, at 8). But this belief did not give Detective Perdomo probable cause to search Plaintiff's home, nor did it fall under any exception to the warrant requirement.   Furthermore, although Detective Perdomo stated in her deposition that Plaintiff's wife consented to the search of Plaintiff's coats in his home (ECF No. 17-3, at 10), Plaintiff's wife provides conflicting testimony, and her version must be credited at this stage.   Specifically, Plaintiff's wife gave the following testimony during her deposition:

> Q: Did an officer ask you for permission to look for a particular item in your house?
>
> A: No
>
> Q: When you were downstairs and the officers went upstairs, how many officers went upstairs and looked through your house?
>
> A: Three.
>
> Q: And [] did an officer stay with you?
>
> A: Perdomo stayed downstairs.
>
> . . .
>
> A: Actually, I'm sorry, they actually searched it twice.

Q: Okay.

A: Another cop searched it while I was
upstairs. He came in – it was a black
officer -- and asked was the house searched.
And Perdomo told him, yes, but you're
welcome to search it again. And so he said,
yes, I'll do that. So he searched it again.

(ECF No. 18-2, at 3). Moreover, as Plaintiff points out, "[t]he
search [] was conducted <u>after</u> it had already been concluded that
Mr. Taylor was not the wanted individual and thus the officers
cannot reasonably claim that the searches were justified because
they were reasonably mistaken about Mr. Taylor's identity."
(ECF No. 18, at 6) (emphasis in original). Accordingly,
Plaintiff has satisfied his burden of showing a constitutional
violation in the search of his home. Defendant has failed to
show that the right to be free from warrantless searches of the
home absent exigent circumstances and consent was not clearly
established. Detective Woodside will be granted summary
judgment on the illegal search claim because he did not
participate in searching Plaintiff's home. Summary judgment
will denied, however, on the illegal search claim against
Detective Perdomo.

   **B.   Assault, Battery, and False Arrest (Counts I-III)**

   Plaintiff also asserts three state law tort claims against
Detectives Woodside and Perdomo: assault, battery, and false

30

arrest.    "A  battery  occurs  when  one  intends  a  harmful  or offensive  contact  with  another  without  that  person's  consent." *Nelson  v.  Carroll*,  355  Md.  593,  601  (1999);  *accord  Johnson  v. Valu  Food,  Inc.*,  132  Md.App.  118,  123  (2000).    An  assault  is  an attempt  to  do  the  same.    *Cont'l  Cas.  Co.  v.  Mirabile*,  52  Md.App. 387,  398  (1982);  *accord  Lee  v.  Pfeifer*,  916  F.Supp.  501,  505-06 (D.Md.  1996).    False  arrest  is  another  intentional  tort  that occurs  when  three  elements  are  present:  "' 1)  the  deprivation  of the  liberty  of  another;  2)  without  [his]  consent;  and  3)  without legal  justification.'"    *Dett  v.  State*,  161  Md.App.  429,  441 (2005)  (*quoting  Heron  v.  Strader*,  361  Md.  258,  264  (2000)). Claims  of  assault,  battery,  and  false  arrest  can  only  advance "when  there  is  no  legal  authority  or  justification"  for  the officer's  actions.    *Hines  v.  French*,  157  Md.App.  536,  551  (2004) (*quoting  Williams  v.  Prince  George's  Cnty.*,  112  Md.App.  526,  554 (1996)).

The  complaint  states  that  "Woodside  *and*  Perdomo  battered [P]laintiff  by  throwing  him  to  the  ground."    (ECF  No.  2 ¶ 16) (emphasis  added).    The  complaint  further  asserts  that "Detectives  Woodside  and  Perdomo  assaulted  [P]laintiff  by causing  him  to  reasonably  apprehend  that  he  would  be  subjected to  imminent  harmful  and  offensive  contact."    (*Id.* ¶ 13). Although  the  complaint  asserts  assault  and  battery  counts against  Detective  Perdomo,  in  the  deposition,  Plaintiff

identifies Detective Woodside as the officer who made a dent in his car, threw him on the ground, and put his foot on his back. Mr. Taylor does not identify Detective Perdomo as an officer who had – or attempted to have - any physical contact with him. Furthermore, it is undisputed that Detective Perdomo spoke with Plaintiff's wife at the time Detective Woodside interacted with Plaintiff in his car.  Accordingly, summary judgment will be granted as to the battery, assault, and false arrest claims against Detective Perdomo.

As to Detective Woodside, for the reasons explained *supra*, there is a genuine dispute as to whether the force he applied was legally justified considering Plaintiff's allegations that he complied with his commands.  Thus, the battery and assault claims against Detective Woodside survive summary judgment.  As for the false arrest claim, there is a question of fact whether there was a deprivation of liberty.  Moreover, as discussed in the context of the Fourth Amendment claim, "[o]nce [Detective Woodside] [] determined that Mr. Taylor was *not* Mr. Ford, [he] no longer had any legal justification to continue to hold Mr. Taylor or to question him." (ECF No. 18, at 8).  Accordingly, summary judgment will be denied as to the state law tort claims against Detective Woodside.

**IV.   Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Defendants Josefina Perdomo and Clint Woodside is granted in part and denied in part.   A separate order will follow.

                              _____/s/_____
                              DEBORAH K. CHASANOW
                              United States District Judge

33